UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CIVIL ACTION NO. 3:06-CV-656-H

STEPHEN C. YOUNG                                                    PLAINTIFF

V.

CITY OF RADCLIFF, et. al.                                          DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff Stephen C. Young ("Young") has brought a 42 U.S.C. § 1983 claim alleging that Defendants violated his Fourth, Fifth, and Fourteenth Amendment rights by their actions in connection with a shooting and arrest which occurred at Young's residence (Count I).  Young also brings various state law claims, including violation of Ky. Rev. Stat. Ann. § 344 (Kentucky Civil Rights Act), false arrest/false imprisonment (Count IV), assault (Count V), battery (Count VI), intentional infliction of emotional distress (Count VII), and outrageous conduct (Count VIII).  There are two groups of Defendants:  City of Radcliff and City of Radcliff Police Officer Tucker Raifsnider ("Raifsnider") and Kentucky State Police Troopers James Kevin Burton ("Burton") and Steven Eric Smallwood ("Smallwood") (collectively "Defendants").[1]  Both groups of Defendants have moved for summary judgment and their arguments partially overlap.

This is a difficult and unfortunate case.  Young was wrongly targeted as a suspect in a

---

[1]Young has also sued "Unknown Defendant Employees of Kentucky State Police."  No motion for summary judgment has been made on behalf of those defendants.

shoplifting with which he had no connection whatsoever.  The police officers conducted an unusual "knock and talk" which included sending some officers to the rear of Young's property. Those officers observed that Young was armed with a .45 caliber automatic pistol in a holster. This concerned the officers who tried to alert their fellow officers at the front door.  The resulting ruckus alarmed Young who appeared at his backdoor, and then drew his pistol.  The combination of these misjudgements and confusion led to Young's shooting and arrest.

Certainly, these events should never have occurred.  Indeed, Young believes that he should never have been charged with a crime because he did not intend to draw a gun on police, but only upon suspected intruders.  Nevertheless, he was charged with two felonies, which were later reduced to misdemeanor charges.  A Hardin Circuit Court jury found Young guilty of criminal menacing, which is a misdemeanor.

It is not easy to apply formal constitutional strictures to misjudgments piled onto mistakes combined with the unpredictability of split-second human reactions.   Whether our rules of law are capable of untangling these conflicting rights, much less provide Young some satisfaction, is the subject of this Memorandum Opinion.  Young's civil complaint attempts to redress all of the perceived wrongs.  The Court must confess that its analysis leads to conclusions which conflict with the natural impulse to cooperate in that effort.

I.

The relevant evidence of these undeniably unfortunate events stated most favorably to Young follows.

On the evening of December 4, 2005 a shoplifting of approximately sixty to seventy dollars occurred at the Wal-Mart in Radcliff.  Young was neither at the Wal-Mart nor in any way

2

involved with the shoplifting.  However, his specialty license plate bore the same number as that of the vehicle driven by the shoplifters (but whose license plate had a different background picture).  Consequently, the Radcliff police identified Young's vehicle through a vehicle license plate database search.  Young's vehicle information was reported to Raifsnider, who had responded to the initial shoplifting report from Wal-Mart.  Raifsnider requested that the Kentucky State Police verify that the vehicle was at the address to which it was registered, and Smallwood, who was driving a marked Kentucky State Police cruiser at the time, confirmed that it was.

After obtaining consent from his supervisor, Raifsnider, without a search or arrest warrant, proceeded to Young's residence where he  "intended to conduct . . . an investigative technique called a 'knock-and-talk,' and ask questions, for instance about whether [the suspect] had been in Radcliff that night . . ." Mot. for Summ J. 3.   Smallwood, Burton and two deputies from the Hardin County Sheriff Department[2] met Raifsnider at Young's residence at around 11:30 p.m.  The Defendants pulled into Young's driveway with their headlights turned off.

Young was at home in his kitchen awaiting his wife's return from work.  Young was armed with a handgun in a holster on his right hip.  Raifsnider and one of the deputies approached the front door of Young's residence while Smallwood and Burton went to the rear of the residence and stood outside a fence located approximately 15-20 feet from Young's back door.  Raifsnider knocked on the front door twice.  Young, who is hearing impaired and who may have been distracted by a television, did not hear the knock.

Very near the time that Raifsnider was knocking, Burton looked through Young's glass

---

[2]The Hardin County deputies are not parties to this suit.

3

back door and observed him inside his home with a pistol on his hip holster, which he had a perfect right to possess.  Burton yelled to notify the other officers that Young was armed. Burton and Smallwood's Mot. for Summ. J. 7.  Plaintiff, hearing the noise from his back yard went to the rear of his home, opened the back door and asked who was there.  Burton identified himself as "State Police" and shouted statements to the effect of "put your hands up" and "don't touch the gun." *Id.* at 8.  Young did not respond to the commands, which he says were "distorted by his hearing impairment."

Young, apparently concerned about unidentified persons in his back yard, reached for his gun.  Burton says that upon seeing Young draw his gun, and because Young had not responded to Burton's yelled commands, Burton fired a total of six rounds, one of which hit Young in the forearm. Young says that he was in the process of retreating from the back door to go inside and call 911 when he was shot.  After he was shot, Young appeared with his hands up and then crawled onto the back porch and was handcuffed by one of the Hardin County deputies and was placed into custody.  Young consented to a search of his home.

After Emergency Medical technicians arrived, Young requested that he not be transported to the hospital until his wife arrived home from work so that he could let her know he was okay.  Young alleges that someone he could only identify as "a captain" responded, with explicatives, "[i]f you don't get in the ambulance, I am going to hog tie [you] and throw you on the floorboard of the cruiser."  Young was treated for his injuries at the hospital.  In his pleadings, but without reference to supporting evidence, Young says that it is "undisputed" that he was "h[eld] for hours in uncomfortable positions" and "kept in painful handcuffs for several hours" and "questioned late into the night" and subject to unspecified "dehumanizing acts."

Resp. to Burton and Smallwood's Mot. for Summ. J. 8, 11.

The Kentucky State Police charged Young with two felony counts of wanton endangerment, charges Young says were reported to local news media. The prosecutor later reduced the charges to misdemeanor counts of menacing. "A person is guilty of menacing when he intentionally places another person in reasonable apprehension of imminent physical injury." Ky. Rev. Stat. Ann. § 508.050(1). Young was found guilty of menacing Burton. He was not charged a fine or sentenced to any time in jail in connection with his conviction. The jury found that Young was not guilty of menacing Smallwood.

## II.

Defendants have moved for summary judgment under Fed. R. Civ. P. 56. The Court will grant a motion for summary judgment if the evidence submitted shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)(citing Fed.R.Civ.P. 56(c)). In applying Rule 56(c)), a court views the evidence in a light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A court properly enters summary judgment where there is not sufficient evidence in support of the non-movant's case upon which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## III.

As a threshold matter, the Court considers how Young's state court conviction of criminal menacing Burton affects various aspects of Young's §1983 claim. The jury instructions in that trial required a "not guilty" verdict in a variety of circumstances: where Young had reason

5

to believe that his actions were "necessary in order to protect himself" from physical force by Burton, or "immediately necessary to prevent the commission of criminal trespass upon real property in his possession,"or "immediately necessary to prevent burglary of his dwelling," or if Young had "reasonably believed that [] Burton was not a peace officer and posed a threat to his person or property."

Burton argues that Young's conviction bars Young's § 1983 claim relating to Burton's use of force (specifically the shooting) during Young's arrest. *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (where the Supreme Court held that a prior state court conviction may bar § 1983 claims which would label the conviction invalid). However, a Sixth Circuit panel recently held that the *Heck* bar does not apply where a plaintiff had not had an opportunity to vindicate his federal rights through a habeas action. *See, e.g. Powers v. Hamilton County Public Defender Com'n*, 501 F.3d 592, 603 (6th Cir. 2007). The Court need not determine whether the *Powers* exception applies because the separate state law doctrine of res judicata seems a more appropriate fit. As the Supreme Court acknowledged in *Heck*, res judicata is a separate issue from the cognizability of §1983 claims, and "the res judicata effect of state-court decisions in § 1983 actions is a matter of state law." *Id.* at 480 n.2 (citing *Migra v. Warren City School Dist. Bd. of Ed.*, 465 U.S. 75 (1984)).

"Under Kentucky law, res judicata, or claim preclusion, 'may be used to preclude entire claims that were brought or should have been brought in a prior action, while the doctrine of collateral estoppel [or issue preclusion] only applies to issues actually litigated.'" *Donovan v. Thames*, 105 F.3d 291 (6th Cir. 1997)(quoting *City of Covington v. Board of Trustees of Policemen's and Firefighters' Retirement Fund*, 903 S.W.2d 517, 521 (Ky.1995)). Issue

preclusion, or here non-mutual collateral estoppel, may also apply against a party to a prior suit even though the parties in the subsequent law suit are not identical to the parties in the prior action. *City of Covington*, 903 S.W.2d at 522 (citing *Sedley v. City of West Buechel*, 461 S.W.2d 556 (Ky.1970)).  However, preclusion must be "based on rules of justice and fairness" rather than "an automatic imposition of a doctrine." *City of Covington*, 903 S.W.2d at 522.  The Kentucky Court of Appeals has held that "under proper circumstances, a criminal conviction may be used for purposes of collateral estoppel in later civil proceedings." *Gossage v. Roberts*, 904 S.W.2d 246, 248 (Ky. Ct. App.1995) (citing *Roberts v. Wilcox*, 805 S.W.2d 152 (Ky. Ct. App.1991)). The *Gossage* court summarized Kentucky law on issue preclusion thusly:

> The general rule is that a judgment in a former action operates as an estoppel only as to matters which were necessarily involved and determined in the former action, and is not conclusive as to matters which were immaterial or unessential to the determination of the prior action or which were not necessary to uphold the judgment.

904 S.W.2d at 248-49 (quoting *Sedley*, 461 S.W.2d at 558-59).

The difficult task here is to apply Kentucky's res judicata doctrine to various aspects of Young's § 1983 claim.

### A.

The use of deadly force is only constitutionally reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Sigley v. City of Parma Heights*, 437 F.3d 527 (6th Cir. 2006)(quoting. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer of the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Further, "the calculus of

reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396-97.[3]  Young's conviction for menacing means that a jury has already determined beyond a reasonable doubt that Burton was in reasonable apprehension of imminent physical injury from Young and his handgun.  For Young to argue that Burton lacked probable cause to believe that Young posed a threat of serious physical harm, is completely contrary to this jury determination.  Moreover, the court specifically instructed the jury as to the affirmative defenses of self-protection, protection of property and mistake of fact.

Undoubtedly, Young would believe that such a result compounds an already unjust series of events.  However, this Court cannot undo or ignore the result in Hardin Circuit Court even though those not present may find it difficult to comprehend.  These issues were actually litigated and the jury determined these facts adversely to Young. Kentucky's res judicata doctrine requires this Court to respect that verdict by precluding Young from contesting these facts again here.[4]

---

[3]In considering how broadly to view the circumstances relevant to the excessive force issue, the Sixth Circuit analyzes §1983 claims separately and in some circumstances will "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." *See Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)(internal quotation omitted).  Thus, the fact that Burton's decision to proceed to the rear of Burton's property may constitute a separate Fourth Amendment violation does not preclude a finding that his subsequent use of force was reasonable.

[4]Finally, even if collateral estoppel did not effectively bar Young's excessive force claim, Burton would likely be entitled to qualified immunity on his use of force since there is no controlling authority from the Supreme Court on Sixth Circuit that would put an officer on notice that use of deadly force in response to a person drawing a firearm would violate the Fourth Amendment, and there is precedent within this Circuit for qualified immunity in use of force cases involving the belief of presence of firearms. *See, e.g. Bell v. City of East Cleveland*, 125 F.3d 855 (6th Cir. 1997)(Table);  *Leong v. City of Detroit*, 151 F. Supp. 2d 858 (E.D. Mich. 2001).

B.

An arrest without probable cause violates the Fourth Amendment. *Donovan,* 105 F.3d at 297 (citing *Beck v. Ohio*, 379 U.S. 89 (1964)). "The Supreme Court has held that the test for whether an arrest is constitutionally valid is 'whether, at the moment the arrest was made, the officers had probable cause to make it-whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.' " *United States v. Dotson*, 49 F.3d 227, 229 (6th Cir. 1995) (quoting *Beck*, 379 U.S. at 91). Therefore, Young's menacing conviction precludes him from arguing that the officers who seized him lacked a reasonable belief that Young had committed or was committing an offense. In other words, he is barred from now denying that he engaged in intentional criminal conduct. *See Gossage*, 904 S.W.2d 246.

C.

Finally, Young's seizure claim requires two results. Young's menacing conviction does not preclude his pursuit of damages for any Fourth Amendment violation that occurred prior to the time his actions placed Burton in "reasonable apprehension of imminent physical injury."[5] Young claims that the Defendants seized him without lawful cause. Compl. ¶ 1. To the extent that Young alleges that an unreasonable seizure occurred *after* Young menaced Burton, however, his claim is barred by res judicata because Young's conviction establishes that Young *intentionally* placed Burton in *reasonable apprehension* of *imminent* physical injury by reaching

---

[5]For purposes of this analysis, the Court concludes that this occurred at the moment Plaintiff appeared to reach for his gun. *See* Jury Instructions (describing the crime as placing Burton in "reasonable fear of immediate physical injury by reaching for and/or drawing a firearm.").

9

for and/or drawing a firearm.

IV.

The Court now turns to Young's Fourth Amendment claims which involve events that occurred prior to Young's menacing and which collateral estoppel does not bar.  Defendants have asserted the defense of  qualified immunity.[6]  Though the Sixth Circuit has struggled mightily to clarify it, qualified immunity remains a difficult concept to apply.  The Sixth Circuit recently summarized the qualified immunity analysis:

> Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  There are two steps in the analysis: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established . . . When considering a claim of qualified immunity, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

*King v. Ambs*, 519 F.3d 607, 610 (6th Cir. 2008)(quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)(other internal quotations omitted).[7]  Specifically, Defendants argue that "a reasonable

---

[6] Young argues that Defendants' actions were ministerial, not discretionary, and that Defendants were therefore not entitled to qualified immunity under Kentucky law.  Young says that because the Radcliff Police Department Standard Operating Procedures establish mandatory practices for initiating police-citizen contact, Defendants' conduct was ministerial. Cases controlling governmental tort immunity under Kentucky law, however, do not control the analysis of whether the *federal* defense of qualified immunity is available to officers sued under 42 U.S.C. § 1983 for violating a federal right.  *See Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007).  Under any analysis, the Court does not find the manner in which Defendants conduct a shoplifting investigation to be ministerial.  *See, e.g. Stratton v. Com*, 182 S.W.3d 516 (Ky. 2006)(comparing the discretionary decisions involved in child protective services investigations to those required in "police investigations.").  In addition, the Sixth Circuit applies a qualified immunity analysis to a variety of alleged Fourth Amendment violations occurring in the course of police investigations.  *See, e.g. Hardesty v. Hamburg Tp.*, 461 F.3d 646 (6th Cir. 2006); *Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002).

[7]The Sixth Circuit occasionally performs a third step which asks "whether the plaintiff offered sufficient evidence to indicate that what the official did was objectively unreasonable in light of the clearly established light."  *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999)(en banc).  "Both the two-step approach and the three-step

officer would not have been on notice . . . that it is a violation of the Fourth Amendment to walk around to the rear of a shoplifting suspect's residence in a rural area while remaining outside a fenced enclosure . . . especially where, as here, the officers [were] not on a quest for evidence but [were] merely observing to see if anyone exits the residence while another officer knocks at the front door."  Reply 6.

The Court begins the analysis by determining whether constitutional violations have occurred.  Defendants arrived at Young's residence without a search or arrest warrant. Raifsnider says that he intended to initiate a consensual encounter with Young based on the license plate match.  Burton and Smallwood say that they intended to "provide assistance" while "operating under the good faith assessment that they were assisting in a criminal investigation at a residence where a vehicle allegedly involved in a recent shoplifting incident had been located." Reply 2-4.  The undisputed evidence indicates that Burton and Smallwood went to the back of the house where they were able to see inside Young's residence from their vantage point fifteen to twenty feet from his glass back doors.  In a number of ways Defendants' conduct here could amount to a Fourth Amendment violation resulting from either an unreasonable search or seizure.  The Court will consider each one.

A.

The Court first considers Young's § 1983 claim to the extent that it can be construed as asserting a Fourth Amendment violation resulting from an unreasonable search.  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant

---

approach can be said to capture the holding of *[Saucier]*."  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005).  Here, the Court applies the two-step approach.

are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).  In general, an unreasonable search is defined in terms of a person's "reasonable expectation of privacy" and is analyzed under a two-part test.  *Widgren v. Maple Grove Tp.*, 429 F.3d 575, 578 (6th Cir. 2005)(citing *Katz v. United States*, 389 U.S. 347 (1967)).  First, "has the individual manifested a subjective expectation of privacy in the object of the challenged search?" and (2) "is society willing to recognize that expectation as reasonable?" *Widgren*, 429 F.3d at 578 (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)).  "Assessing the degree of intrusion requires addressing both the methods used and the purpose for the intrusion."  *Id.* at 583.

"A criminal investigation is generally more intrusive than an administrative or regulatory investigation."  *Id.*  Generally, a search involves looking "over or through for the purposes of finding something,"  *Kyllo*, 533 U.S. 27, 33 n.1 (2001), although "a search may occur even where the officer was not intentionally looking for something, so long as the 'objective effect of his actions' infringed on a reasonable expectation of privacy." *Widgren*,  429 F.3d at 580 (quoting *United States v. Maple*, 348 F.3d 260, 263 (D.C. Cir. 2003)).  The Sixth Circuit has also described a search to imply "an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action." *Taylor v. Michigan Dept. of Nat. Res.,* 502 F.3d 452, 457 (6th Cir. 2007)(quoting *United States v. Blackburn*, 389 F.2d 93, 95 (6th Cir. 1986)).

Fourth Amendment protections hinge on the occurrence of a search.  Burton and Smallwood argue that because they were "merely observing to see if anyone exited the rear of the residence" (as opposed to a "quest for evidence") and because they did not enter the fenced perimeter of Young's backyard, they were not engaged in a search for purposes of the Fourth

12

Amendment.  However, the subjective intent of the officers is impossible to discern and irrelevant to determining whether their actions amount to a search.  *See Taylor*, 502 F.3d at 457 (6th Cir. 2007)(citing *Bond v. United States*, 529 U.S. 334, 339 n.2 (2000)).  The Court concludes that what Burton and Smallwood describe as "observing the rear of the residence" amounts to a search, if the *Katz* analysis indicates that the object of the search was subject to a reasonable expectation of privacy.

1.

The first question under *Katz* is whether Young manifested a subjective expectation of privacy in the *object* of the challenged search.  Burton and Smallwood's testimony indicates that they were peering into the interior of Young's home through his glass back doors, effecting a visual search of the interior of Young's home.[8]  The Supreme Court has described observation of the interior of the home as "the prototypical . . . area of protected privacy."  *Kyllo ,* 533 U.S. at 27. Indeed, "[a]t the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  *Id.* at 31(quoting *Silverman v. United States*, 365 U.S. 505 (1961).  It is hardly remarkable, therefore, to conclude that Young could subjectively expect privacy when he was inside a room at the back of his home at 11:30 at night. *Cf. Ciraolo*, 476 U.S. at 215 (quoting *Katz*, 389 U.S. at 361)(Harlan, J. concurrence))(noting, "a man's home is, for most purposes, a place where he expects privacy . . .").

The second part of the *Katz* inquiry examines whether this expectation was one society recognizes as reasonable, or in other words "what the person wanted to protect his privacy *from*,

---

[8] "And they were the kind of doors that are full glass - just like a - a full glass door.  When he stood up, when I saw this man stand up, I saw that there was a gun in a holster on his right side."  Resp. to Burton and Smallwood's Mot. for Summ. J. Exh. 3 (Burton Sworn Statement).

13

for example, non-family members . . . strangers passing by on the street." *Widgren*, 429 F.3d at 579 (citation omitted).  The Fourth Amendment protection of the home does not "require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.  Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where *he has a right to be* and which renders the activities clearly visible." *Ciraolo*, 476 U.S. at 213.

2.

Next the Court must determine whether Burton and Smallwood had a "right to be" at the location on Young's property when they peered into his home.  Burton and Smallwood argue that because they did not enter the fenced perimeter of Young's backyard, they were in "open fields," a term which defines an area in which a property owner has no reasonable expectation of privacy, and from which vantage point an officer can peer into constitutionally protected areas. *See United States v. Dunn*, 480 U.S. 294 (1987)(concluding that observation of objects protected by the Fourth Amendment from a vantage point in the open fields does not violate the Fourth Amendment); *Oliver v. United States*, 466 U.S. 170, 177 (1984); *United State v. Rapanos*, 115 F.3d 367, 372 (6th Cir. 1997).  A related concept is that Fourth Amendment protections also extend to the curtilage around a home.  *See Oliver*, 466 U.S. at 180.  *Id.* at 180.

Curtilage includes the land surrounding and associated with the home which "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Hardesty v. Hamburg Township*, 461 F.3d 646 (6th Cir. 2006)(quoting *Dunn*, 480 U.S. 294 at 300 (1987))(internal quotation omitted).  In *Dunn*, the Supreme Court explained that:

14

curtilage questions should be resolved with particular reference to four
factors: (1) the proximity of the area claimed to be curtilage to the home,
(2) whether the area is included within an enclosure surrounding the home,
(3) the nature of the uses to which the area is put, and (4) the steps taken by
the resident to protect the area from observation by people passing by.

480 U.S. at 301 (numbers added).  Applying the four *Dunn* factors here, the Court concludes that

the area where Burton and Smallwood stood was within the curtilage.  First, Burton testified that

he was "about 15 to 20 feet away from the back – the back door of the house . . ."  Interview

with James Kevin Burton Dec. 6, 2005 3.  When courts have found an area to be beyond the

curtilage, the distance from the home is typically far greater.  *See, e.g. Dunn*, 480 U.S. at 302

(barn located sixty yards not within curtilage); *Rapanos*, 115 F.3d at 372 (6th Cir. 1997)(finding

that property consisting of 175 acres, with no buildings, bordered by an interstate highway a

major state highway is an "open field").  Thus the proximity to Young's home weighs heavily in

favor of finding the area to be within the curtilage.

The second factor might suggest that they were in an area beyond the curtilage because

Burton and Smallwood were standing outside a fence.  It is true that courts often consider the

fence as a strong indication of the boundary of the curtilage.  The photographic exhibits of

Young's residence submitted by Burton and Smallwood, however, reveal that the "nature and

uses to which the area is put" indicate that the fence did not necessarily mark the boundary of the

"intimate activity" and actually enclosed only a very small area directly adjacent to the house.

In addition, a covered grill, dinner triangle, chairs, and birdhouse all were situated just

outside the small wooden fence in the area where Burton and Smallwood stood.  Although these

items were not within an enclosure, they manifest evidence that the area where the officers were

standing was used for activities and privacies of domestic life, and was not as Burton and

15

Smallwood argue, an "open field." *See, e.g. Widgren,* 429 F.3d at 582 (finding that a picnic

table, a fire pit, and pruned trees sufficient to indicate an area is within curtilage); *United States*

*v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997)(finding evidence of laundry and gardening to

weigh in favor of finding an area to be within curtilage).

Finally, the very location of the area where the officers were standing, behind Young's

house, was naturally protected from passers by on the pubic adjoining road. As the Sixth Circuit

has recognized:

> The backyard and area immediately surrounding the home are really
> extensions of the dwelling itself.  This is not true simply in a mechanical
> sense because the areas are geographically proximate.  It is true because
> people have both actual and reasonable expectations that many of the
> private experience of home life often occur outside the house.

*Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 601 (6th Cir. 1998)(quoting *Dow Chemical v.*

*United States*, 749 F.2d 307, 314 (6th Cir. 1984), *aff'd* 476 U.S. 227 (1986)).  Thus consideration

of the *Dunn* factors and reference to Sixth Circuit precedent indicate little to distinguish Young's

backyard from other backyards that have been held to be curtilage.  *See Widgren*, 429 F.3d at

582; *Daughenbaugh*, 150 F.3d at 600-01 ("The backyard and area immediately surrounding the

home are really extensions of the dwelling itself.").  Thus, the *Dunn* factors weigh in favor of

finding that the area where Burton and Smallwood were standing was part of the curtilage of

Young's home.

3.

Based on the foregoing analysis the Court concludes that when Burton and Smallwood

peered into Young's home, they did so from within the curtilage - a constitutionally protected

area where an individual has a reasonable expectation of privacy.  *See Daughenbaugh*, 150 F.3d

16

at 598.  Their vantage point was not the open fields of Young's property or a public

thoroughfare, or an area of Young's property impliedly open to public use.  It was an area more

distinctly private and reserved for personal use.  The Fourth Amendment does not "permit

officers to begin a warrantless search while standing in a constitutionally protected area." *Id.* at

601.[9]   The officers consequently violated Young's Fourth Amendment right by conducting a

warrantless search of his home when they explored details of the activities on the interior of

Young's home that would have been unknowable without physical intrusion into a

constitutionally protected area on Young's property. *Cf. Kyllo*, 533 U.S. 27; *see Daughenbaugh*,

150 F.3d at 602.

B.

Before proceeding to the second step of the qualified immunity analysis, the Court

considers whether Defendants, in addition to effecting an unlawful search, also effected an

unlawful seizure.  "Absent exigent circumstances, [the threshold to a home] may not reasonably

be crossed without a warrant." *Payton,* 455 U.S. at 590.  On some occasions, the law recognizes

a "constructive entry" into the home even though the officers have not physically crossed the

threshold.  Of course, police officers may engage in consensual encounters with suspects without

running afoul of the Fourth Amendment.  *See, e.g. Bennett v. City of Eastpointe*, 410 F.3d 810,

---

[9]A leading treatise on the subject describes that "courts have held 'that police with legitimate business may enter the areas of the curtilage which are impliedly open to use by the public,' and in so doing they 'are free to keep their eyes open and use their other senses.'  This means, therefore, that if police utilize 'normal means of access to and egress from the house,' for some legitimate purpose, such as to make inquiries of the occupant or to introduce an undercover agent into the activities occurring there, is not a Fourth Amendment search for the police to see or hear or smell from that vantage point what is happening inside the dwelling.  *On the other hand, if the policy stray from that path to other parts of the curtilage in order to conduct the surveillance, then the use of natural sight or hearing to detect what is inside is a search within the meaning of the Fourth Amendment.*" 1 Wayne R. LaFave, Search and Seizure: Looking at or Listening at the Residence §2.3(c)(4th ed. 2007)(emphasis added).

17

921 (6th Cir. 2005); *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000).  Specifically, the Sixth Circuit recognizes a "knock and talk," as "a legitimate investigative technique at the home of a suspect or an individual with information about an investigation."  *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2006); *Ewolski v. City of Brunswick*, 287 F.3d 492, 504-05 (6th Cir. 2002).  A "knock and talk" typically involves an officer going to the front door to speak with the occupants, or asking for consent to search the premises.  *See, e.g. United States v. Chambers*, 395 F.3d 563, 568 n.2 (6th Cir. 2005); *Ewolski*, 287 F.3d 492.

In any constitutional analysis, a consensual encounter in the course of a "knock and talk" may "evolve into a 'constructive entry' when the police, while not entering the house, deploy overbearing tactics that essentially force the individual out of the home." *Thomas*, 430 F.3d at 277.  This occurs when a suspect emerges "in response to coercive police conduct." *Id.* (quoting *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984)); *United States v. Saari*, 272 F.3d 804 (6th Cir. 2001)(describing coercive police conduct as "such a show of authority that [the] Defendant reasonably believed he had no choice but to comply.").  *Thomas* instructs that the difference between "a permissible consensual encounter and an impermissible constructive entry turns on the show of force exhibited by police." 430 F.3d at 277.

The Court must apply the standards to determine whether Defendants' conduct amounts to an unreasonable seizure.  Notably, several facts distinguish the cases where the Sixth Circuit has found a "constructive entry"and unreasonable seizure from the facts here.  First, unlike the commands over a bullhorn shouted to the plaintiff in *Morgan*, Burton's initial yell seems to have been intended to alert his fellow officers that he had observed that Young was armed.  Though the intent of the officer is certainly not dispositive in a Fourth Amendment analysis, shouts that

18

someone is armed are distinguishable from direct commands to exit a residence.  In this way, Burton's initial yell was less a show of force than the commands in *Saari* and *Morgan*.  Young did not understand the initial shouts to be commands to emerge from his home.  Furthermore, until Young attempted to draw his weapon, there is no evidence that the officers had their weapons drawn as the officers in *Saari* did.

On the other hand, the facts before the Court, are in several ways similar to those cases where a "knock and talk" included impermissibly coercive procedures.  Here, as in *Morgan*, it is undisputed that Young was peacefully residing in his home prior to Defendants' arrival.  He logically responded to the noise by going to his backdoor.  Yelling from the rear of a person's home, for whatever reason, is not consistent with the initiation of a consensual encounter.  Also, as in *Morgan* several patrol cars approached Young's residence in the dark, and strategically parked their cars to block movement of Young's vehicle. *See* 743 F.2d at 1164.  Defendants here pulled into Young's driveway with their headlights off.  And, as in *Morgan*, the officers had effectively surrounded Young's home when Burton and Smallwood went to the back of Young's residence, while Raifsnider approached the front door.

The incident also involved some conduct that the *Saari* court described might indicate a seizure, including "the use of language or a tone of voice indicating that compliance with the officer's request might be compelled."  272 F.3d at 808.  Here, it is undisputed that Young emerged upon hearing noises from the back of his property.  In the context of a "knock and talk," the Sixth Circuit has described that:

> a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

19

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Saari*, 272 F.3d 804, 808 (6th Cir. 2001)(quoting *United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980)(opinion of Stewart, J.).  Applying the *Mendenhall* standard, the *Morgan* court rejected the government's contention that "once Morgan appeared at the door holding a weapon in plain view, the police were justified in immediately arresting him and seizing the weapon." 743 F.2d at 1164.  The *Morgan* court concluded that, "[v]iewed objectively, Morgan was placed under arrest, without the issuance of the warrant, *at the moment the police encircled the Morgan residence*." *Id.* (emphasis added).

1.

This raises a question of precisely when, in the course of a warrantless police visit to a residence, a seizure occurs.  Here, a number of answers are possible.  The *Morgan* court pinpoints the seizure "at the moment the police encircled the Morgan residence." *Id.*[10]  The broadest reading of *Morgan* suggests that the seizure occurred at the moment the police blocked Young's vehicle in his driveway and surrounded his home by sending officers to the front and back of his property, effectively surrounding all the exits.  If blocking a vehicle and surrounding the home is, without more, enough to constitute a show of force and coercive behavior, then Defendants effected an unreasonable seizure even without saying a word.

---

[10]Of course, prior to being summoned from his home in response to shouted commands, Morgan could not have known that his vehicle was blocked or his home surrounded by officers.  The same is true here.  Because Young apparently did not hear Raifsnider's knocking at the front door, he presumably did not know that police were present at the front and a the rear of his property or that his vehicle was blocked.

However, other panels of the Sixth Circuit have analyzed the level of coercion based on what the person alleging an unreasonable seizure *actually* knew about the location or level of police presence.  *See, e.g. Thomas*, 430 F.3d at 280 (finding an encounter with multiple officers non-coercive and noting, "Thomas has never argued that he saw all of these [police] vehicles before leaving the house."); *United States v. Grayer*, 232 Fed.Appx. 446 (6th Cir. 2007)(unpublished)(finding no constructive entry in the absence of drawn weapons, raised voices, coercive demand, or a large number of officers in plain sight and finding it significant that the police squad cars "were parked in a manner blocked from Grayer's view from the front door.").  The difficulty of answering whether, under Sixth Circuit precedent, blocking a vehicle and surrounding a home effects a seizure is reflected in the subsequent qualified immunity analysis.

### 2.

In addition to blocking his vehicle and surrounding his home, Defendants also shouted from Young's backyard, shined a flashlight on him, and eventually ordered him to put his hands up and not touch his gun.  Considering these additional facts, the seizure could, consistent with *Morgan* and subsequent Sixth Circuit decisions be said to have occurred at either of two points. The earlier point is the moment police shouted from the backyard, causing Young to emerge from his house.  Under this view, Young emerged in response to police shouting (even though it may not have been directed at him or intended to compel him to exit his home) while his house was surrounded and his vehicle blocked.  Here, the three factors indicating a police show of force include the blocking and surrounding combined with the shouting from the backyard. However, it is undisputed that Burton's initial shouts were directed not to compel Young to exit

21

his home, but to alert his fellow officers that they were approaching an armed man.[11]

The latest point the Court could pin a pre-shooting seizure is when Burton shined a flashlight on Young, who was standing in the doorway, identified himself as state police and directed him not to touch his gun.  These circumstances are more similar to those present in *Morgan* and *Saari*.  In any case, if Defendants are confronted with exigent circumstances, a warrantless seizure at home does not violate the Fourth Amendment.  *See, e.g. Ewolski*, 287 F.3d at 492.

3.

In conclusion, Sixth Circuit precedent indicates three alternative moments when Young was arguably seized: (1) at earliest, under *Morgan*, when Defendants blocked his vehicle and surrounded the exits to his home; (2) slightly later, when Burton shouted to alert Raifsnider that Young had a gun; (3) at latest, when Burton yelled at Young to put his hands up and not to touch his gun.  The Court need not definitively pinpoint the exact moment that the seizure occurred.  The Court need only assume that at one of the three points described above the manner in which Defendants executed the "knock and talk" was impermissibly coercive and effected an unreasonable seizure in violation of the Fourth Amendment.[12]

---

[11]"When he stood up, when I saw this man stand up, I saw there was a gun in a hoster on his right side.  I yelled, told the officers that he had a gun."  Burton's Resp. to Young's Interrog. 10.

[12]The Sixth Circuit has, under some circumstances,  recognized the legitimacy of the knock and talk technique beyond the front door to inquiry at the back door.  *See Hardesty v. Hamburg Township*, 461 F.3d 646, 654 (6th Cir. 2006)(holding "where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage."); *Thomas*, 430 F.3d at 280 (officers knocking on back door did not violate the Fourth Amendment because there was no "reasonable expectation of privacy" in the use of a back door that "was customarily used as the entrance to the house.").  Those circumstances, however, are quite unlike those here.  Here, the officers were not concerned about the proper entrance because they had not tried one entrance unsuccessfully.  This was an entirely different matter.  Sneaking around the backyard is not part of a legitimate constitutional "knock and talk."

C.

Having concluded that the Defendants' conduct amounted to an unreasonable search and assuming an unreasonable seizure in violation of the Fourth Amendment, the Court considers the second step, whether any of these rights were clearly established. *King*, 519 F.3d at 610 (6th Cir. 2008). Here, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The Court applies this step separately to the unreasonable search and to each potential unreasonable seizure.

1.

The Court begins with the unreasonable search. "The right of individuals to be free from unreasonable and warrantless searches is a clearly established constitutional right. Courts have accepted the general principle that, absent special circumstances, 'warrantless searches are presumptively unreasonable.'" *Daughenbaugh*, 150 F.3d at 603 (citing *Horton v. California*, 496 U.S. 128, 133 (1990)). Burton and Smallwood's search from Young's backyard violated this general principle.

Whether a reasonable person would have known he was violating a clearly established constitutional right poses a much closer question. As the Sixth Circuit has noted, the "we know it when we see it" approach to curtilage. . .provides little guidance to courts attempting to determine whether a particular area falls within a home's curtilage." *Id.* at 598; *Jenkins*, 124 F.3d at 772 (observing that "[t]he concept of curtilage, unfortunately, evades precise definition."); *United States v. Reilly*, 76 F.3d 1271, 1273 (2d Cir. 1996)(noting that curtilage is "an area where the contours of search-and-seizure law are anything but clear"). The fact-

23

intensive nature means that "every curtilage determination is distinctive and stands and falls on its own unique set of facts." *Reilly*, 76 F.3d at 1276.

Even though "the law seems relatively unambiguous that a backyard abutting the home constitutes curtilage and receives constitutional protection," *Daughenbaugh*, 150 F.3d at 603, reasonable officers could have concluded that the fenced enclosure marked that boundary to Young's backyard and curtilage. *See Dunn* 480 U.S. at 302. While such a conclusion would be wrong because the fence was close to the property, did not provide a privacy shield, and contained a grill that was outside the fence, it would not be an unreasonable one under the circumstances. If, as Defendants believed, they were standing beyond the curtilage in the open fields of Young's rural property, naked eye observation of the interior of his home or his constitutionally protected backyard would not amount to unconstitutional activity. *See id.* at 304 (concluding "there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields . . . the fact that the objects observed by the officers lay within an area . . .protected by the Fourth Amendment" does not alter this conclusion.)[13]

Because it was not unreasonable for Defendants to conclude that the area outside a fenced enclosure in a rural area was not within the curtilage, they are entitled to qualified immunity for the Fourth Amendment violation resulting from the unreasonable search.

2.

The Court now considers whether the unreasonable seizure resulting from the manner in

---

[13]"Nor is the government's intrusion upon an open field a 'search' in the constitutional sense because that intrusion is a trespass at common law." *Oliver v. U.S.* 466 U.S. 170, 183 (1984)

which Defendants executed the "knock and talk" involved a clearly established constitutional right of which a reasonable person would have known.  The Court's task is to determine whether, at each of the three points when a seizure could have occurred, an objectively reasonable officer, confronted with similar circumstances, could have reasonably believed that the conduct he was undertaking did not effect a warrantless seizure or that exigent circumstances justified his conduct.  *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

The Court first assumes that, as the language in *Morgan* suggests, the seizure occurred at the moment that Defendants blocked his vehicle and surrounded his house without his knowledge.  Even if the Court were to conclude that the Fourth Amendment violation occurred at that moment, qualified immunity is still appropriate.  In the cases where courts have recognized a constructive entry (including *Morgan*), there has been more than simply blocked vehicles and surrounded homes.  In *Morgan*, police used a bullhorn and bright floodlight to compel the suspect to emerge from his home.  In *Saari*, the police appeared with their weapons drawn and pointed at a forty-five degree angle.  In *Ewolski*, the police paraded an armored vehicle in front of the suspect's home.

Young argues vigorously that Defendants' deviation from the Radcliff Police Department Standard Operating Procedures regarding Police-Citizen Contacts is relevant to showing that Defendants "knew, or reasonably should have known, of the necessity of acting within the requirements of the constitutional principles set out in the [police manual]."  Resp. to Mot. for Summ. J. 10.  Young says the manual required Defendants "to know how to conduct a knock and talk within constitutional bounds."  Although it is true that the manual defines the internal policy limits for the police department, the policy manual does not, as Young argues, render "the

25

general state of the jurisprudence" regarding the legality of police conduct "academic." Although the policies contained in the manual may provide evidence that Defendants should have known their actions were inconsistent with the policy manual, the failure to follow internal policies does not amount to a constitutional violation. *Fultz v. Whittaker*, 261 F. Supp. 2d 767, 782 (W.D. Ky. 2003)(citing *Barber v. City of Salem, Ohio*, 953 F.2d 232, 240 (6th Cir. 1992). Even assuming that the operating procedures tracked the law on constitutional seizures, the existence of those procedures would not necessarily make it clear to an officer in Defendants' situation that his actions were per se unconstitutional.

*Morgan* notwithstanding, without precedent in the Sixth Circuit where blocking a vehicle and surrounding a home alone constitutes constructive entry in violation of the Fourth Amendment, and in light of the Sixth Circuit cases seemingly requiring some level of coercion notifying a person about the police activity, a reasonable officer could believe that blocking a driveway and surrounding a home, without more, did not effect a warrantless seizure. Therefore, Defendants are entitled to qualified immunity to the extent that such conduct did amount to an unreasonable seizure.

3.

The Court next considers a slightly later point in time when the combination of surrounding of Young's home, blocking his vehicle and shouting from the backyard could constitute a seizure. Here, the Court must consider what activity caused Young to emerge from his home where he was peaceably residing. Young's testimony is that: "I only heard my dogs barking and went to the back door. I saw intruders and heard them shouting to each other, but could not make out any details, and thought they were attacking me." Young's Response to Wal-

26

Mart's Discovery Requests 5-6.  In the light most favorable to Young, the Court will assume that the dogs were barking in response to Burton's shout that he had observed Young in his home with a gun.  Even if this were true, the Court cannot conclude that Burton's decision to shout to alert his fellow officers that Young was armed, was objectively unreasonable.

Although the subjective intent of the officer is not dispositive, Young's emergence and seizure under these circumstances is distinguishable from those cases where the person emerged in response to direct and unequivocal demands to do so or in response to seeing police with weapons drawn.[14]  *See, e.g. Morgan*, 743 F.2d 1158; *Saari*, 272 F.3d at 808.  Although while he was in his home Young did not pose an immediate threat to the officers, Burton and Smallwood knew that other officers were attempting to initiate contact with an armed person.  Upon observing Young with a gun, Defendants could have been reasonably alarmed and believed that the concern for officer safety at least justified alerting fellow officers that Young was armed. They could also have reasonably believed that shouting to alert a fellow officer did not rise to the level of coercion necessary to effect a seizure as a result of a constructive entry.

Thus, to the extent that Burton yelling to warn Raifsnider could be considered an impermissibly coercive show of force, Defendants are entitled to invoke qualified immunity.

4.

The latest that a pre-shooting seizure arguably occurred is at the moment Burton shined a flashlight on Young, yelled at him to put his hands up, and told him not to touch his weapon. Here, Young was armed and was reaching for his gun in response to the unexplained intruders in

---

[14]"An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham,* 390 F.3d at 397.

his backyard at 11:30 at night.  *See* Young's Resp. to Wal-Mart's Discovery Requests.  Young was standing in his doorway with a gun because he was aroused from his home where he was peaceably residing before hearing noises from police who were sneaking around and shouting from the back of his property.  In other words, he appeared at the door because of the police activity taking place outside his home.

Assuming a Fourth Amendment violation on these facts, to conclude that an officer would be *unreasonable* and therefore liable for damages when he instructs an armed person not to touch or use his gun would seem to ignore the realities of officer safety, which are judged from the perspective of the reasonable officer on the ground.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989).  Under the Supreme Court precedent, even though Defendants' mistakes led to the situation in which the circumstances arose, they could still be entitled to the benefit of qualified immunity if the mistakes as to the legality of their actions were reasonable.  *Cf. Saucier*, 533 U.S. at 206 ("Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity for *reasonable mistakes* as to the legality of their actions.").  It follows that even if the Court were to conclude that Defendants did violate the Fourth Amendment *before* Plaintiff even emerged from his home, Defendants are not foreclosed from invoking qualified immunity for their subsequent conduct.  *See Dickerson*, 101 F.3d at 1160.  Even if Defendants' belief that Young's emergence with a gun justified their conduct was mistaken, "the officers are entitled to the benefit of the doubt under the qualified immunity standard." *See id.*

At the moment Young appeared, Defendants could have reasonably believed that Young's confusion and armed status justified attempting to prevent Young from drawing his

weapon by yelling at him not to touch his gun and put his hands up.  This is  true because it could be reasonable for Defendants to believe (even mistakenly): (i) simply surrounding the house and blocking his vehicle did not effect a seizure as a result of impermissibly coercive conduct; (ii) the shouting that prompted Young to emerge was justified for officer protection; and (iii) then attempting to stop him from drawing his gun was also justified for officer safety.

"The qualified immunity inquiry's concern . . . is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 195.  Here, at each stage when a seizure could have occurred, the police were reasonable, though arguably mistaken, in their belief that they were operating within the legal restraints on their actions.  As such, they are entitled to qualified immunity for any unreasonable seizure that occurred in violation of the Fourth Amendment.

V.

Young also brings several state law claims, alleging violation of Ky. Rev. Stat. Ann. § 344 (Kentucky Civil Rights Act), false arrest/false imprisonment, assault, battery, and intentional infliction of emotional distress (IIED).[15]  The Court must look at each of these separately.  Some are easier to resolve than others.

The basic purpose of the Kentucky Civil Rights Act is "to safeguard all individuals within the state from discrimination because of race, color, religion, national origin, sex, age forty (40) and over, or because of the person's status as a qualified individual with a disability." Ky. Rev. Stat. Ann. § 344.020(1)(b).  In general, the Act protects individuals against

---

[15] Young's complaint alleges separate counts for "intentional infliction of emotional distress" (Count VII) and "outrageous conduct," (Count VIII).  Kentucky common law recognizes these as the same tort, and the Court therefore analyzes Counts VII and VIII as a single claim.

discrimination in the employment context and also ensures that no individual may be denied the equal enjoyment of a place of public accommodation, resort or amusement facility.  The statute does not apply to discrimination that may occur during an interaction between a citizen and a police officer and therefore Young has failed to state a claim for a violation of Ky. Rev. Stat. Ann.§ 344.  The Court will sustain Defendants' motion for summary judgment on this basis.

Young also argues that being "held for hours on felony charges that were so clearly excessive" was "so unreasonable"as to constitute a false arrest. Under Kentucky law, an action for false arrest may only be maintained when the arrest is without legal authority.  Young's state court conviction for menacing bars him from arguing that his arrest was "without legal authority" or not supported by probable cause. But even if there were no probable cause to arrest Young for the felonies for which he was initially charged, proof of probable cause to arrest a person for a related office is a defense that would entitle an officer to qualified immunity.  *See Avery v. King*, 110 F.3d 12 (6th Cir. 1997).  For this reason, Defendants are entitled to judgment as a matter of law on Young's false arrest claim.

In the case of an action against a law enforcement officer, a claim for false imprisonment is for "detention without legal authority—that is, detention without legal process." *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007).  Young complains of being held for hours after his arrest, but once again his menacing conviction precludes him from arguing that the detaining officers lacked legal authority in the first place, and Young had not offered specific information alleging that how he was denied any of his Fifth or Sixth Amendment rights to counsel which would be available to a person in custody.  Without other evidence, the Court is unable to conclude that

being held or questioned for "hours" denied Young "legal process" or that it states a claim for false imprisonment.  The Court is likewise unable to assess the viability of Young's allegation that he was held in "uncomfortable positions" or that he was subjected to "dehumanizing acts." Without any further description or elaboration of the substance of these allegations, the Court lacks sufficient information to conclude that a reasonable juror could return a verdict in his favor based only on these vague allegations.[16]

Young alleges that Defendants committed battery by shooting him, "shoving him, handcuffing him and otherwise wrongfully touching him."[17]  Under Kentucky law, a "battery" is an unlawful touching of another.  A person is liable for "assault" if his acts intend to cause a harmful or offensive contact.  *Humphress v. United Parcel Service, Inc.*, 31 F. Supp. 2d 1004 (W.D. Ky. 1997).  He has not put forth any evidence describing the circumstances under which the alleged shove occurred.  Even assuming that Young was "kept in painful handcuffs for

---

[16]The Court has thoroughly reviewed the record for evidence or facts which could support Young's claims. In Young's response to interrogatories posed by a party who is now dismissed, Young provides the most thorough summary of the post-shooting events, stating:

> I was bullied, pushed, shoved, made to stay in uncomfortable positions, was insulted, kept in uncomfortable positions, and treated much worse than I was trained by the Army to treat war prisoners. . .I was still kept in handcuffs and in uncomfortable positions, and still in pain . . . [following interrogation at KSP Post 4] . . . unknown Defendants wrongfully charged me, several hours later, with two felony counts . . .After the interrogation at Post 4, I was again placed in handcuffs and kept in painful positions, and was lodged in the jail through part of the next day.  Unknown Defendants caused the false felony charges to be published, including to the news media."

Pl.'s Resp. to Wal-Mart's Discovery Requests.  Young does not allege that Burton, Smallwood, or Raifsnider personally took any of these actions.  However, Young also appears to argue that Raifsnider is liable in a supervisory capacity for the alleged assault and battery committed by other unidentified officers because Raifsnider was in charge of the entire investigation at Young's home.  This theory of liability also fails because Young must show that Raifsnider otherwise encouraged or condoned the actions of the other officers. *See Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999); *Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir.1995).  The record contains no evidence that this occurred.

[17]Young's menacing conviction bars his claim for assault and battery with respect to the shooting because he cannot relitigate whether the shooting was justified.

several hours" in an unlawful manner after his arrest, Defendants would only be liable for this injury if they: (1)observed or had reason to know that excessive force would be or was being used, and (2) had both the opportunity and the means to prevent the harm from occurring. *Smoak v. Hall,* 460 F.3d 768 (6th Cir. 2006)(quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

Here, Young does not allege that Burton, Smallwood, or Raifsnider personally shoved him, handcuffed him, or otherwise unlawfully touched him. Young has alleged no facts which could allow a reasonable juror to find that Raifsnider, Burton, or Smallwood even knew that the handcuffs were painful (i.e. heard Young complain of their tightness) or knew that they were kept on for "several hours"after his arrest.  There is no evidence, for example, that Raifsnider, Burton, or Smallwood accompanied Young to the hospital or to the location where he was "questioned late into the night."  Therefore, Young has failed to allege facts sufficient to prove his claim for assault or battery against Burton, Smallwood, or Raifsnider and their motion for summary judgment is sustained with respect to those claims.

In order to recover for IIED, Young must show that Defendants' conduct after the shooting was "so outrageous and intolerable so as to offend generally accepted standards of morality and decency, that a causal connection exists between the conduct complained of and the distress suffered, and that the resulting emotional stress was severe." *Brewer v. Hillard*, 15 S.W.3d 1 (Ky. Ct. App. 1999).  Where an actor's conduct amounts to the commission of one of the traditional torts, such as assault, battery for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie. *Banks v. Fritsch*, 39 S.W.3d 474 (Ky. Ct. App. 2001).  Young argues that

32

"all of Defendants' actions after the shooting were clearly only intended to inflict extreme emotional distress." Even if this were true, Young has offered no evidence that either Burton, Smallwood, or Raifsnider was the person who denied him an opportunity to speak with his wife, shoved him, placed him in handcuffs, or held him in uncomfortable positions. For this reason, no reasonable juror could conclude that the Defendants who have moved for summary judgment committed the tort of IIED.

VI.

Finally, the Court considers whether the City of Radcliff could be liable for any of injuries Young alleges. Section 1983 does not permit a plaintiff to sue a local government entity on the theory of respondeat superior. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978). A plaintiff may only hold a local government entity liable under § 1983 for the entity's own wrongdoing. *Id.* A local government entity violates § 1983 where its official policy or custom actually serves to deprive an individual of his or her constitutional rights. *Id.* A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers. *Id.*

Where the identified policy is itself facially lawful, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (internal citation omitted). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. In other words, the risk

33

of a constitutional violation arising as a result of the inadequacies in the municipal policy must be "plainly obvious." *Id.* at 412; *see also Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir.1997).

Young points to no policy or custom which caused the Fourth Amendment violations described above.  By contrast, he argues extensively that Raifsnider's knock and talk investigation deviated from the City of Radcliff's standard operating procedures.  Young holds the City of Radcliff's standard operating procedures as the "definitive authority as to how the knock and talk should have been conducted."  This characterization certainly does not permit the conclusion that the City of Radcliff's official policy was facially unconstitutional or was the cause of the deprivation of Young's rights.

Young also argues that the City was "deliberately indifferent" in the need to competently identify citizens holding "specialty" license plates, the need to train police officers to deal with hearing impaired citizens, and in the need to supervise employees to prevent the violations he alleged.  "Allegations that a particular officer was improperly trained are insufficient to prove liability, as are claims that a particular injury could have been avoided with better training." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir.1998). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs v. Brown*, 520 U.S. at 410.

Young has not presented any evidence, however, which could permit a jury to conclude that the City of Radcliff failed to train or supervise either Officer Raifsnider in particular or any of its officers in general.  The City of Radcliff has provided evidence that the dispatch trainer completed mandatory dispatch training. In sum, there is not evidence before the Court that

34

Young's injuries were the result of the policy or custom or deliberate indifference on the party of the City of Radcliff.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record